**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| ALAYA SMITH, individually and on behalf of all others similarly situated, | **Case No. 4:26-cv-144** |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| EUROPEAN WAX CENTER, INC. | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Alaya Smith ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, brings this class action complaint against Defendant European Wax Center, Inc. ("Defendant" or "European Wax Center"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

**NATURE OF THE ACTION**

1.      Courts have recognized that opaque digital tracking practices threaten consumer privacy. Users have a basic expectation of privacy in their online activity. Unauthorized collection of browsing activity, interactions, and device identifiers violates that expectation. Companies often represent that users may control whether their data is sold, shared, or tracked. When data continues to be transmitted after those representations have been made, the conduct is improper.

2.      European Wax Center, Inc. operates a commercial website, https://www.waxcenter.com/ (the "Website"), through which users browse services and pricing, locate studio locations, schedule and manage appointments, purchase products and gift cards, and access promotional offers. Like many modern websites, the Website displays a cookie banner and

a cookie preferences interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties. The banner assures users that they may control the sale or sharing of their personal information and may decline all non-essential cookies through a hyperlink labeled "Do Not Sell My Personal Information."

3.    Defendant's assurances are false.

4.    The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment a user lands on any page. This occurs before the user can view or act upon the Cookie Settings.

5.    Worse still, even after users affirmatively disable the sale or sharing of their personal information and reject all non-essential cookies, the Website continues to utilize and deploy the Tracking Tools capable of transmitting users' data to advertising, social media, and analytics companies (the "Tracking Entities").



*Figure 1 – Cookie Banner of European Wax Center representing users could change tracking behavior through Cookie Settings*

6.    The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and videos viewed or requested; inferred interests, preferences, age, location, or other characteristics based on user behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation

information derived from IP addresses or similar signals. Collectively, this information is referred to as "Sensitive Information."

7.      Accordingly, Defendant's misleading assurances and representations lull users into a false sense of privacy and control, all while allowing third parties to monitor users' online behavior in real time.

8.      Plaintiff's experience reflects the conduct described above. Plaintiff visited the Website, most recently in or around December 2025, in order to book services via the Website. During this visit, her personal information, including browsing activity and device identifiers, was intercepted and recorded by certain Tracking Tools and Tracking Entities as soon as she visited the Website, despite the presence of a cookie banner and Cookie Settings that purport to allow users to prevent the sale or sharing of Sensitive Information when toggled off. Based on Defendant's representations, Plaintiff believed that the Website would honor these choices. Instead, Defendant continued to procure Tracking Tools to transmit Plaintiff's browsing activity, page interactions, navigation patterns, and identifiers to the Tracking Entities for advertising and analytics purposes.

9.      As a result, Defendant violated Federal Wiretap Act, 18 U.S.C. § 2510, et seq.; Texas Deceptive Trade Practices and Consumer Protection Act, Texas Statutes § 17.41 et seq.; as well as common-law prohibitions against intrusion upon seclusion, fraud and deceit, unjust enrichment, and related statutory and common-law protections. Plaintiff brings this action on behalf of herself, and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d) (2) (A). Defendant has its principal place of business located in Plano, Texas, in this District. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e).

11.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

12.     Venue is proper in this Court because Defendant's principal place of business is located at 5830 Granite Parkway, 3rd Floor, Plano, Texas 75024 in this District.

## PARTIES

13.     Plaintiff Alaya Smith is, and has been at all relevant times, a citizen and resident of Pennsylvania. Plaintiff used the Website for its intended purpose. Specifically, Plaintiff accessed the Website to browse European Wax Center services, locations, and review promotional content. Plaintiff has an account with the Website that she used when she browsed on the website and booked a service via the Website in December 2025. Plaintiff accessed the Website on the same devices and through the same web browser that she used to access social media platforms and third-party websites, including Meta (Facebook and Instagram), Google-operated services, and other digital social platforms. Plaintiff was physically located in Pennsylvania at all relevant times while accessing and using the Website. For example, when

Plaintiff visited the Website in December 2025, her Sensitive Information, including browsing activity and device identifiers, was intercepted and recorded by certain Tracking Tools and Tracking Entities as soon as she visited the Website, despite the presence of a Cookie Settings that assured people that tracking would not continue when they chose to deactivate cookies that were not necessary. Plaintiff more recently visited the Website in connection with the investigation of this case and attempted to disable the Tracking Tools on the Website by using the Cookie Settings to decline all non-essential cookies. When she visited the Website on February 02, 2026, Plaintiff engaged the Cookie Settings to disable the Tracking Tools, believing the Website's claim that she could disable marketing cookies. Despite Defendant's assertions, choosing to decline all non-essential cookies did not disable the Tracking Tools. The Website continued to track Plaintiff after she chose to reject the cookies. As a result of Defendant's implementation of third-party Tracking Tools on the Website, and its fraudulent statements in the Cookie Settings, Plaintiff's personal information, including browsing activity and device identifiers, was intercepted and recorded by Tracking Tools and Tracking Entities. If Plaintiff could rely on Defendant's representations in its Privacy Policy and Cookie Settings, Plaintiff would continue the use of the Website.

14.    Defendant European Wax Center, Inc. is a Delaware corporation in the business of providing personal grooming and hair removal services through a nationwide network of franchised and company-owned studios, and of supporting the marketing, administrative, operational, technological, and commercial operations of those studios to consumers throughout the United States, including through commercial websites and digital platforms. European Wax Center, Inc. operates and maintains the Website and related digital services used by customers to locate studios, schedule appointments, purchase products and gift cards, and access promotional

offers. European Wax Center, Inc. is incorporated under the laws of the State of Delaware and maintains its principal mailing address at 5830 Granite Parkway, 3rd Floor, Plano, Texas 75024. Its registered agent in Texas is Corporate Creations Network Inc., 5444 Westheimer, Suite 1000, Houston, Texas 77056.

## FACTUAL ALLEGATIONS

### I.    How Websites Function

15.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

16.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

17.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[2]

18.    When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[3]

---

[1] *Browsing the Web: The difference between webpage, website, web server, and search engine*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Feb. 8, 2026).
[2] *Id.*
[3] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 8, 2026).

19.    An IP address is "a unique address that identifies a device on the internet or a local network."[4] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

20.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response, which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[5]

21.    This Request URL includes a domain name and path, which identifies the specific content being accessed on a website and its location within the website's structure.

22.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[6] as depicted below:

---

[4]    *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 8, 2026).
[5] *Id.*
[6] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).



*Figure 2 - Mozilla's diagram of a URL, including parameters[7]*

23.    Website owners or web developers write and manage the URLs for their websites.

24.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[8] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

25.    The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[9] Today, UTF-8 is the Internet's most common character encoding.[10]

26.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[11] To demonstrate:

*Figure 3 – Demonstrating URL encoding and decoding[12]*

---

[7]    *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 8, 2026).

[8]    *Id.*

[9]    *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Feb. 8, 2026).

[10]    *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Feb. 5, 2026).

[11]    *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct., 2020), https://gochyu.com/blog/url-encode-decode (last visited Feb. 8, 2026).

[12]    Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Feb. 8, 2026).

27.    Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.



*Figure 4 – Sample webpage used to demonstrate a webpage URL*



*Figure 5 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 3)*



*Figure 6 – Decoded, parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

28.      After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code that of the webpage, which is then processed by the user's browser and "rendered" into a visual display

according to the instructions of the HTML code.[13] This is the visible, and usually interactable, website that most people think of.

29.    To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages such as JavaScript snippets within the HTML documents.[14]

30.    Such complex tasks include streaming videos by Users or subscribing to Newsletters/ Digital Magazine, or code used to monitor and report user activity.

31.    In short, the Internet relies on a constant back and forth stream of requests. These processes are exploited by tracking technologies embedded in websites.

32.    Unbeknownst to users, as they browse websites, like Defendant's Website, the Tracking Tools, including third and first-party cookies, capture and record both incoming and outgoing requests that make up their experience on the Website.

## II.    The Website and the Tracking Tools

33.    On the Website, Defendant procured Tracking Entities' services and Tracking Tools, including those created by Facebook, Google and Trade Desk, enabling the Tracking Entities to intercept users' Sensitive Information contemporaneous with the sending or receiving of communications from users' internet browsers, without seeking or obtaining users' consent.

### A.    The Meta Pixel

34.    Facebook offers its own tracking pixel known as the Facebook or Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

---

[13]    *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 8, 2026).

[14]    *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 8, 2026).

35.    The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Meta Pixel.[15]

36.    Upon creating a Meta Pixel, a pixel ID (also called a DataSet ID by Meta), is generated.[16] This pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a pre-determined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used receive the collected data when programming the Pixel directly into a website.[17]

37.    This pixel ID must match "a known Pixel ID" in Meta's system,[18] and is transmitted by the Meta Pixel.[19]

38.    As Facebook notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[20]

39.    The Meta Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[21] Receiving this information enables Facebook and Defendant to

---

[15]    *Setup    and    install    the    Meta    Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Feb. 8, 2026).

[16] *Id.*

[17] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Feb. 8, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[18]    *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Feb. 8, 2026).

[19] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 8, 2026).

[20]    *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Feb. 8, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[21] The Meta Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 8, 2026).

build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[22]

40.    The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[23]

41.    Once implemented on a website, the Meta Pixel begins to share users' information the moment a user lands on the website.

42.    When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[24] These cookies allow Facebook to link the data it receives through the Meta Pixel to individual Facebook users.

43.    The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.



*Figure 7 – Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Facebook Pixel*

44.    The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 7*, appending it to the

---

[22] *See Meta Pixel_ Unlock smarter advertising with insights from your website.*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Feb. 8, 2026).
[23] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 8, 2026).
[24] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Feb. 8, 2026).

Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will

redirect the webpage straight to the Facebook profile associated with the UID, as depicted below:



*Figure 8 – Sample Facebook account created by Plaintiff's counsel to investigate the Facebook Pixel, with FID highlighted in URL*

45.     The Meta Pixel tracks user-activity on web pages by monitoring events,[25] which

when triggered, causes the Pixel to automatically send data – here, users' Sensitive Information

---

[25]          *About          Meta          Pixel*,          FACEBOOK,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited
Feb. 8, 2026).

– directly to Facebook.[26] Examples of events utilized by websites include a user loading a page with a Pixel installed (the "PageView event");[27] The Website utilizes this PageView event.[28]

46.    The Meta Pixel also transmits its unique pixel IDs via the "id" parameter, which contains Defendant's pixel IDs of "223291612328760", "1035642271793092" and "217978161072109."

47.    Defendant leverages the Meta Pixel to monetize its Website users' Sensitive Information.

48.    Facebook independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

49.    Defendant's use of the Meta Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website.

---

[26] *See generally id.*

[27] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Feb. 8, 2026).

[28] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper tool*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Feb. 8, 2026).



*Figure 9 – Facebook Pixel tracking a user landing on the webpage from Figure 13 through the "PageView" event*

50.    When a business applies with Facebook to use the Meta Pixel, it is provided with detail about its functionality, including with respect to private information.[29]

---

[29]    *See Get Started*, Meta, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Feb. 8, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your

51.    To make use of the Meta Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

52.    The Facebook Terms inform website owners using Meta's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[30]

53.    The Facebook Terms are transparent that Meta will use the Meta Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[31]

54.    Facebook directs parties implementing the Meta Pixel—here, Defendant—to encrypt request information[32] *before* data can be shared.[33]

55.    Facebook further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

---

website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[30] *Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGod nMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 8, 2026).

[31] *Id.*

[32] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See id.*

[33] *Id.*

56.    Facebook educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third party.[34]

57.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

**B.    Google Analytics**

58.    Google's tracking tools are not implemented by Google by default; instead, website owners must take multiple affirmative steps to deploy the tools and enable the resulting data sharing.

59.    European Wax Center implements Google Analytics to Intercept users' Sensitive Information.

60.    Like the Facebook Pixel, Google Analytics ("GA") invisibly collects data about user interactions with a website, including link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.

61.    The data collected through GA is sent back to Google, which associates the activity with the website it was collected from. Notably, Google notifies web developers that they should

---

[34] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Feb. 8, 2026).

provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."

62.    To use GA, the website operators must include the specific Google Tag ID associated with their websites, which allows Google to link the collected data back to their profile on Google products.[35]

63.    Defendant's Google Tag ID is included in transmissions sent to and from users' devices, as seen in *Figure 2*—the HTTP request URL contains the Google Tag ID, listed after "tid=", and referenced as "G-983WWQZ8RG".

64.    In short, the use of GA involves specific data collection practices, pre-configured settings, and known transmission paths for user data. Google acknowledges the legal risks associated with its tracking tools and explicitly shifts the responsibility for informing users and obtaining any required consent onto website operators like Defendant.

65.    Here, Defendant added GA to its Website by (1) creating an Analytics account; (2) designating its Website as a property; (3) adding a data stream to determine what information to collect; and (4) adding the GA tag to its website.

66.    Defendant's decision to implement GA into the Website resulted in the interception and redirection of Plaintiff's search terms to Google, as depicted from the example taken directly from the Website below:

---

[35]    *About        the        Google        Tag* https://support.google.com/tagmanager/answer/11994839?hl=en&ref_topic=14595647&sjid=11744702880709055388-NA (last visited Feb. 8, 2026).



*Figure 10 – Test search made on the Website resulted in Google Analytics intercepting search terms "ingrown hair wipes" and redirecting them to Google*

67.     After arriving, Google provides analysis and feedback, which helps Defendant monetize the collected information through targeted advertising.

**C.     Trade Desk Pixel**

68.     The Trade Desk is a demand-side platform ("DSP"), meaning it provides automation software to assist advertisers in purchasing advertisements.[36]

69.     The Trade Desk ("Trade Desk") provides advertisement purchasers with software tools to manage, analyze, and optimize digital advertising campaigns across multiple channels and inventory sources.[37] Trade Desk works with supply-side platforms ("SSPs"), which are used to manage the supply of advertising inventory for publishers and other entities that sell advertising

---

[36] *What is a demand-side platform (DSP)*, ADJUST, https://www.adjust.com/glossary/demand-side-platform/ (last visited Feb. 8, 2026).
[37] *Trackers: The Trade Desk (adsrvr.org)*, BETTER.FYI, https://better.fyi/trackers/adsrvr.org/ (last visited Feb. 8, 2026).

space on their websites.[38] Trade Desk is integrated with many supply-side platforms that rely on advertising spend generated by advertisers using Trade Desk.[39]

70.    With respect to personalized advertisements delivered to users, Jeff Green, Chief Executive Officer of Trade Desk, described the company's Unified ID 2.0 marketing technology as follows: "[W]e will have effectively solved the identity-matching challenge of the entire open internet on a scale well beyond anything cookies have ever accomplished, and all while providing consumers with much greater control over their privacy."[40]

71.    Among the tracking technologies offered by Trade Desk, and employed by the Website for tracking user behavior and collecting data for targeted advertising, is the Trade Desk Universal Pixel ("TTD Pixel").[41] The TTD Pixel is enabled by placing TTD Pixel code within a website's code, which enables the capture of data on each page of the website and across multiple websites.[42] The TTD Pixel is designed to collect and transmit user data that marketers use to measure, manage, and optimize programmatic advertising campaigns.[43]

---

[38] *What is a Supply-Side Platform?*, PUBLIFT, https://www.publift.com/adteach/what-is-a-supply-side-platform (last visited Feb. 8, 2026).
[39] *Id.*
[40] Chris Kelly, *Trade Desk revenue up 24% as advertisers continue shift to CTV, retail media*, MARKETINGDIVE (Feb. 15, 2023) https://www.marketingdive.com/news/trade-desk-earnings-q4-ctv-retail-media/642825/ (last visited Feb. 8, 2026).
[41] *The Trade Desk Universal Pixel*, TEALIUM, https://tealium.com/integrations/the-trade-desk-universal-pixel/ (last visited Feb. 8, 2026).
[42] *Universal Pixel*, THE TRADE DESK, https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited Feb. 8, 2026).
[43] Mason Widmer, *4 Vital Best Practices for Using The Trade Desk + A Top Tip*, GRAPESEED MEDIA (Nov. 6, 2024), https://grapeseedmedia.com/blog/trade-desk-best-practices/ (last visited Feb. 8, 2026).

72.    The TTD Pixel, like other pixels, is a tracking tool that can be integrated with Trade Desk's platform (the "Platform").[44] The TTD Pixel allows advertisers and site operators to "spend less time placing tags, gain more visibility into user data, and analyze reporting at a more granular level . . . all with the placement of a single tag."[45] The TTD Pixel collects information including demographics, browsing behavior, and conversion events. The precise categories of information collected through the TTD Pixel in this case are described in further detail below.[46]

73.    The TTD Pixel is not limited to computer or browser-based browsing; it is capable of collecting information from mobile platforms, including how a user interacts with mobile applications, and specific details regarding the mobile device being used to access the content and the applications.[47]

74.    An advertiser or website operator that uses the Platform to run campaigns can leverage the TTD Pixel to collect data regarding how users interact across websites, mobile applications, television, and other technologies.[48]

       ***i.***       ***The Trade Desk benefits from the Website's use of the TTD Pixel***

---

[44] The Trade Desk platform refers to the Trade Desk's self-service technologies for buying and managing digital advertising campaigns across various channels and formats (the "Platform"). The Platform allows advertisers to use data to better target specific audiences using the TTD Pixel, along with other technologies. The Platform also provides real-time bidding, where advertisers bid on ad impressions, and can access insights into impressions, clicks, conversions, and audience engagement metrics. The Platform allows for cross-device advertising to smartphones, tablets, TVs, and desktop computers. Overall, the Platform provides advertisers with advertising capabilities, audience targeting, real-time bidding, data analytics, and control over their digital ad campaigns.

[45] *Universal Pixel*, THE TRADE DESK, https://partner.thetradedesk.com/v3/portal/data/doc/TrackingTagsUniversalPixel (last visited Feb. 8, 2026).

[46] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Feb. 8, 2026).

[47] *Privacy and The Trade Desk Platform*, THETRADEDESK, https://www.thetradedesk.com/us/privacy (last visited Feb. 8, 2026).

[48] *Id.*

75.    Integration of the TTD Pixel by Defendant provides benefits to Trade Desk and the Website, as discussed below.

76.    The first benefit provided by the TTD Pixel to Trade Desk is data collection. This data allows Trade Desk to segment user information to create target audiences and track conversions.[49] For example, the TTD Pixel enables Trade Desk to collect user data, including demographic information, browsing behavior, preferences, and interactions with websites.[50] This data is then sent to an SSP, which analyzes bids from multiple DSP, such as Trade Desk, and facilitates the targeting of users based on their information.[51] Trade Desk relies on this information for its business operations.

77.    The TTD Pixel also enables Trade Desk to retarget users by creating lookalike audiences, as the TTD Pixel is "essentially [] just storing a group of people and information about them."[52] A lookalike audience is a group of individuals who are likely to be interested in a business because they share similarities with the business's existing customers.[53] By developing lookalike audiences, Trade Desk enhances its ability to bid for advertising space from SSPs by

---

[49] *What are Pixels and Why Do I Need to Use Them?*, AX Insights (Sept. 3, 2020), https://insights.audiencex.com/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Feb. 8, 2026).

[50] Andy Pitre, *Ad Tracking: What It Is & How to Do It*, HubSpot: Blog (Mar. 10, 2022), https://blog.hubspot.com/blog/tabid/6307/bid/7249/a-marketer-s-guide-to-tracking-online-campaigns.aspx (last visited Feb. 8, 2026).

[51] *Programmatic Advertising: Your Guide to DMPs, DSPs, and SSPs*, GROWTH MARKETING GENIE, https://growthmarketinggenie.com/blog/programmatic-advertising-dmps-dsps-ssps/ (last visited Feb. 8, 2026).

[52] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020), https://insights.audiencex.com/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Feb. 8, 2026).

[53] *Facebook Lookalike Audiences & When to Use Them*, BLACKBOX, https://blackboxdms.com/leveraging-your-data-how-to-build-facebook-lookalike-audiences-when-to-use-them/ (last visited Dec. 23, 2025).

identifying website users who are more likely to generate clicks or conversions based on shared characteristics with existing customers.[54]

78.     Finally, because Trade Desk's primary business model involves charging clients or advertising publishers a percentage of gross spending on the Trade Desk platform, improvements in advertising effectiveness increase Trade Desk's revenue. When advertising targeting efficiency improves by increasing advertising conversion rates (the rate at which clicks turn to sales)[55] advertisers are more likely to shift additional business to Trade Desk, resulting in increased revenue derived from ad sales.[56]

79.     On the Website, the TTD Pixel is configured to intercept Search Terms after a user submits those terms through the PSE and before the resulting search responses are transmitted to and loaded on the user's device, as depicted below, thereby capturing the contents of the user's search communications in transit:[57]



*Figure 11 – Inputting Search Terms into Search Bar results in TTD Pixel Intercepting the Search Terms*

---

[54] *Id.*
[55] *What is a conversion rate (CVR)?*, ADJUST, https://www.adjust.com/glossary/conversion-rate/ (last visited Feb. 8, 2026).
[56] Trevor Jennewine, *How Does The Trade Desk Make Money?*, THE MOTLEY FOOL (Oct. 27, 2021 7:35 am EDT) https://www.nasdaq.com/articles/how-does-the-trade-desk-make-money-2021-10-27 (last visited Feb. 8, 2026).
[57] Here, a test search was made using "blue jeans" as the Search Terms.

III.    **Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookies and Tracking Tools**

80.    Defendant voluntarily integrated Tracking Tools from various Tracking Entities into the Website's programming. Defendant's use of such on the Website is performed pursuant to commercial agreements between Defendant and the Third Parties.

81.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests. This allows the Website and third parties to identify the device making the request and to record a session reflecting how the user interacts with the Website.

82.    First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

83.    Third-party cookies are placed by domains other than the Website's domain, such as google.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow third parties to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

84.    As detailed further below, third-party cookies that are placed on users' devices during interactions with the Website are used to intercept and record users' communications for the Third Parties, enabling them to surreptitiously track and collect Website users' personal information and sensitive information in real time. This includes, but is not limited to, information reflecting users' browsing and visit activity, such as webpages viewed, URLs, titles, keywords, time spent on pages, navigation paths, and the frequency and recency of visits to the Website, as well as session-level details including timestamps, duration, and actions taken during Website visits, and referring URLs identifying the website or platform directing the user to the Website.

85.    This tracking further captures detailed interaction and behavioral data, including links, buttons, forms, and other on-page elements selected by users, information entered into search fields, forms, and order interfaces, including location data and preferences, items viewed, customized, or added to carts, and inferred interests, preferences, age, location, or characteristics derived from user behavior and content engagement. In addition, the information collected includes device and technical identifiers such as device type, operating system, browser type, and related identifiers, persistent user identifiers enabling recognition of users across sessions and websites, and approximate geolocation data derived from IP addresses or other signals.

86.    Cookies serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, cookies enable Defendant and the Tracking Entities to enhance revenue and marketing effectiveness through the collection, analysis, and dissemination of user data.

87.     Defendant owns and operates the Website, which allows users to browse European Wax Center's products, explore center locations, and book appointments. When users interact with the Website by navigating pages, clicking links, entering data, or customizing orders, they transmit Sensitive Information directly to Defendant.

88.     Defendant chose to integrate the Website with third-party resources that employ cookies and similar Tracking Tools. As a result, when users visit the Website, both first-party and third-party cookies are placed on their devices and/or transmitted to third-party servers. Because Defendant controls the Website's software code and determines which third-party resources are loaded, Defendant has complete control over how such cookies are placed and whether user data is transmitted to third parties.

89.     Defendant represents in the Website's Cookie Settings, in substance, that it may use personal information to analyze the Website's performance and traffic and may share personal information with third parties for that purpose.

90.     The cookie preferences interface further represents that "targeting cookies" are set throughout the Website by Defendant's advertising partners (Tracking Entities), and that they are used to build a profile of users' interests and to show them relevant adverts on other sites.

> "These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising."[58]

91.     The Cookie Settings also explain that "Social Media Cookies" are set by social media companies and enable users to share content. These cookies help these companies build profiles of users' interests.

---

[58] European Wax Center's Cookie Settings window as it was available when Plaintiff opted out of cookies and tracking technologies on the Website.

"These cookies are set by a range of social media services that we have added to the site to enable you to share our content with your friends and networks. They are capable of tracking your browser across other sites and building up a profile of your interests. This may impact the content and messages you see on other websites you visit. If you do not allow these cookies you may not be able to use or see these sharing tools."[59]

## IV.   Defendant Falsely Informed Users That They Could Opt Out of the Website's Use of Cookies

92.     When users visited the Website, the Website immediately displayed a pop-up cookie consent banner. The banner informed users that the Website "uses cookies" and that information about users' interactions with the Website is shared with social media, advertising, and analytics partners. The banner further presented users with the option to accept cookies or to tell the Website not to sell their personal information.





*Figure 12 – Cookie banner of European Wax Center*

---

[59] *Id.*

93.    Website users who selected the "Do Not Sell My Personal Information" option were presented with a cookie consent preferences window, which represented that users could instruct the Website not to sell their personal data, and to only accept "Strictly Necessary Cookies", which are necessary to "ensure the proper functioning of [the] website."

94.    Upon expanding the section addressing the sale of personal information, Defendant represented to users, in substance, that they could exercise their right to opt out of the sale of personal information by using the toggle switch, and that if users opted out, Defendant would turn off "Performance Cookies" that were not strictly necessary, "Targeting Cookies" set by the Defendant's advertising partners, and "Social Media Cookies" set by social media services.



*Figure 13 – Cookie Settings representing users with an option of disabling the selling of user information*



*Figure 14 - Screen capture as of Feb. 4, 2026, depicting the expanded categories under the "sale of personal data" section*

95.    After users moved the toggle to indicate their choice to disable the sale of their personal information and to decline all cookies other than those strictly necessary and clicked "Confirm My Choices," users were permitted to continue browsing the Website. At that point, the Cookie Settings window disappeared.

96.     Defendant's Cookie Settings led Plaintiff, and all Website users similarly situated, to believe that they had successfully disabled the sale of their information and all not strictly necessary cookies. The cookie banner and Cookie Settings further reasonably led users to believe that Defendant would not allow third parties, through cookies or similar technologies, to access users' Sensitive Information with the Website.

97.     These representations were false. In reality, Defendant did not abide by users' expressed preferences. When users moved the toggles to opt out of the sale of their personal information, they rejected all nonessential cookies. In doing so, they clearly communicated that they did not consent to tracking. Nevertheless, Defendant continued to cause the Tracking Tools, including the aforementioned cookies, to be placed on users' browsers and devices and/or transmitted to the Tracking Entities, together with user data.

98.     Specifically, even after users opted out of the sale or sharing of their personal information and declined all non-essential cookies, Defendant continued to cause cookies to be placed on users' devices and/or transmitted to third parties, resulting in the real-time collection of user data that disclosed Website users' Sensitive Information.

99.     In other words, even after users attempted to protect their privacy by rejecting cookies, Defendant continued to transmit user data to the Tracking Entities.

100.    Website developer tools show the operation of cookies and Tracking Tools on the Website that log network traffic transmitted to and from a user's device while interacting with the Website.

101.    Network traffic logs generated through such tools reveal HTTP requests and transmissions between users' browsers and multiple third-party domains while users visit and interact with the Website.



*Figure 15 – Screenshot depicting Developer Tool on user's browser to record and capture network activity*

102.    These network logs demonstrate that tracking continued even after users rejected non-essential cookies and opted out of the data sharing. Browsers continued to transmit numerous GET and POST HTTP requests containing tracking cookies to third-party domains and otherwise used non-essential cookies to track users.

103.    Through these ongoing transmissions, Website visitors' Sensitive Information was disclosed to Tracking Entities. The Tracking Entities and Tracking Tools track visitors across websites and over time, correlate visitor behavior with other datasets, and compile detailed visitor profiles reflecting preferences, behaviors, demographics, and inferred characteristics. This information is monetized for advertising, analytics, and marketing purposes. The Tracking Tools executed on visitors' browsers enable Tracking Entities that are separate from the parties to the communications to access and use visitors' Sensitive Information. These Tracking Entities collect and use the intercepted communications for their own commercial purposes.

✕    **Headers**    Payload    Preview    Response    Initiator    Timing    Cookies

▼ General

Request URL    https://www.facebook.com/tr/?id=223291612328760&ev=PageView&dl=https%3A%2F%2Fwaxcenter.com&rl=https%3A%2F%2Fwaxcenter.com&if=false&ts=1770161809722&sw=1920&sh=1080&v=2.9.256&r=stable&a=shopify_web_pixel&ec=0&o=12316&fbp=fb.1.1770159609012.471853824812284329&cs_est=true&pm=18hif=9562c5&ler=other&cdl=API_unavailable&it=1770161808957&coo=false&dpo=&eid=sh-25dda862-CB2C-4B68-5A1E-E4
2790FF0E14&cs_cc=1&ccs=8713128400626268cas=94737605260363068%2C8113262778797096%2C7657456557
678582%2C7440393212680544%2C9439460942822466%2C2929788698649201792C6883613758348192%2C6044
350449001854%2C7286663138118898%2C7073806825967030%2C9773437206064240%2C6484103948352979%2
C33456199055531642%2C7412188482234392%2C5327902727306050%2C34518961348997662%2C388786974618
3768&dlc=1&rlc=1&expv2[0]=pl1&expv2[1]=el3&expv2[2]=bc1&expv2[3]=ra0&expv2[4]=rp0&expv2[5]=im1&ex
pv2[6]=hf2&rqm=GET

Request Method    GET

Status Code    🟢 200 OK

Remote Address    157.240.24.35:443

Referrer Policy    origin

▶ Response Headers (10)

▼ Request Headers

:authority    www.facebook.com

:method    GET

:path    /tr/?
id=223291612328760&ev=PageView&dl=https%3A%2F%2Fwaxcenter.com&rl=https%3A%2F%2Fwaxcenter.co
m&if=false&ts=1770161809722&sw=1920&sh=1080&v=2.9.256&r=stable&a=shopify_web_pixel&ec=0&o=1
2316&fbp=fb.1.1770159609012.471853824812284329&cs_est=true&pm=18hif=9562c5&ler=other&cdl=API_
unavailable&it=1770161808957&coo=false&dpo=&eid=sh-25dda862-CB2C-4B68-5A1E-
E42790FF0E14&cs_cc=1&ccs=8713128400626268cas=94737605260363068%2C8113262778797096%2C765745

▼ Request Headers

:authority    www.facebook.com

:method    GET

:path    /tr/?
id=223291612328760&ev=PageView&dl=https%3A%2F%2Fwaxcenter.com&rl=https%3A%2F%2Fwaxcenter.co
m&if=false&ts=1770161809722&sw=1920&sh=1080&v=2.9.256&r=stable&a=shopify_web_pixel&ec=0&o=1
2316&fbp=fb.1.1770159609012.471853824812284329&cs_est=true&pm=18hif=9562c5&ler=other&cdl=API_
unavailable&it=1770161808957&coo=false&dpo=&eid=sh-25dda862-CB2C-4B68-5A1E-
E42790FF0E14&cs_cc=1&ccs=8713128400626268cas=94737605260363068%2C8113262778797096%2C765745
655767858292%2C7440393212680544%2C9439460942822466%2C2929788698649201792C6883613758348192%
2C6044350449001854%2C7286663138118898%2C7073806825967030%2C9773437206064240%2C6484103948
352979%2C33456199055531642%2C7412188482234392%2C5327902727306050%2C34518961348997662%C38
878659746183768&dlc=1&rlc=1&expv2[0]=pl1&expv2[1]=el3&expv2[2]=bc1&expv2[3]=ra0&expv2[4]=rp0&ex
pv2[5]=im1&expv2[6]=hf2&rqm=GET

:scheme    https

Accept    image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

Accept-Encoding    gzip, deflate, br, zstd

Accept-Language    en-US,en;q=0.9

Cache-Control    no-cache

Cookie    datr=OmSCaVph2_kCGYTaai3_76P-; ps_n=1; sb=OmSCaSl--V_5hY2r9MXn-zi; c_user=
fr=1wujK9Vospjbqs8mX.AWe6C2KCYNsGbmY-rKk3YKcTcJV55R0Pk-ppAp5y1jAmmL_Ar-
4.BpgmRQ.AAA.0.0.BpgmRQ.AWfARcX4Kks54BjQ67C3xWVsMAaU;
xs=49%3AsUnW87ix89AosA%3A2%3A1770153036%3A-1%3A-
1%3A%3AAcxLXX_ckiAS5YrTHQomIVkwN_1IIrDosJc5xjbxWA; ar_debug=1

Pragma    no-cache

Priority    i



*Figure 16 – Screenshots depicting Developer Tool on user's browser to record and capture network activity*

104.    The network logs above show that even after users chose to decline all cookies that were not strictly necessary, the Website continued to place cookies from Tracking Entities such as Facebook and Google and continued to allow these Tracking Entities to track and collect users' Sensitive Information on the Website.

## CLASS ALLEGATIONS

105.    Plaintiff brings these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class:

> All consumers who visited and interacted with the Defendant's website in the United States during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "Nationwide Class").

106.    Specifically excluded from the Class is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other

persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

107.    Plaintiff reserves the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

108.    <u>NUMEROSITY</u>: At this time, Plaintiff does not know the number of Class Members of the aforementioned Class. However, given the popularity of Defendant's Website,[60] the number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

109.    <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

   a.    Whether Defendant shared Class Members' personal information with the Tracking Entities or other Tracking Tools;

   b.    Whether Defendant obtained effective and informed consent to do so;

   c.    Whether Defendant misled Class Members by making false or misleading representations regarding its data-sharing practices;

   d.    Whether Class Members are entitled to statutory penalties; and

---

[60] Public web-analytics sources report that Defendant's Website receives over one million monthly visits, reflecting substantial consumer interaction with the website. Statistics available at *Waxcenter.com: December 2025 Traffic Stats,* SEMRUSH (last updated Jan 13, 2026) *https://www.semrush.com/website/waxcenter.com/overview/* (last visited Feb 8, 2026).

e.      Whether Class Members are entitled to injunctive relief.

110.    <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

111.    <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

112.    <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Violation of the Federal Wiretap Act 18 U.S.C. § 2510, et seq.**
**(On behalf of Plaintiff and All Class Members)**

113.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

114.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

115.    The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

116.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

117.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

118.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

119.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

120.    The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

121.    Defendant is a "person" within the meaning of the Wiretap Act.

122.    The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

123.    Plaintiff had a reasonable expectation of privacy in her electronic communications with Defendant's Website, including her searches, browsing activity, and video watching activity, particularly where Defendant represented through its Cookie Settings, and Privacy Policy that users could opt out of the sale/sharing of personal information.

124.    A reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on a commercial website are sensitive. Such communications include searches, website selections, and video watching activity. They convey the substance and meaning of the communication.

125.    Plaintiff, as a reasonable user, is entitled to assume that disclosure of the contents of her communications occurs lawfully and with consent. The opposite assumption would require users to expect routine violations of her privacy.

126.    Plaintiff reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of her electronic communications with Defendant's Website.

127.    During the relevant time period, Defendant caused Tracking Entities to intercept Plaintiff's electronic communications with the Website at the moment they were sent. The electronic communications were transmitted to Tracking Entities without Plaintiff's consent. The intercepted information was monetized. Defendant combined that information with data collected about Plaintiff across the internet and used it for advertising, analytics, and marketing optimization.

128.    Interception occurred whenever Plaintiff interacted with the Website, including when she navigated webpages, used search features, booked an appointment for services, or otherwise communicated information to the Website through her browsers.

129.    At all relevant times, Defendant acted knowingly, willfully, and intentionally. Defendant is a sophisticated commercial entity that knowingly procured, embedded, and enabled the Tracking Tools on the Website and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

130.    Defendant did not ask Plaintiff to consent to the interception, recording, disclosure, or use of her electronic communications with the Website by the Tracking Entities. Plaintiff instead affirmatively declined sharing/selling her personal information through Defendant's privacy settings.

131.    The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a). As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including: (1) damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or (b) statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and (3) reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### Intrusion Upon Seclusion
### (On behalf of Plaintiff and All Class Members)

132.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

133.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against the Defendant.

134.    Defendant intentionally intruded upon Class Members' solitude or seclusion in that it effectively placed the Tracking Entities in the middle of conversations, including Sensitive Information to which it was not an authorized party.

135.    Defendant's participation in the Tracking Entities' tracking and interception of Sensitive Information was not authorized by Plaintiff or Class Members.

136.    Plaintiff had a reasonable expectation of privacy in her Sensitive Information because Defendant represented that they were able to disable the Tracking Tools on the Website.

137.    Defendant's enabling of the Tracking Entities' intentional intrusion into Plaintiff's and Class Members' Sensitive Information was highly offensive to a reasonable person in that they fraudulently represented that users could disable Tracking Tools on the Website.

138.    Secret monitoring of Sensitive Information is highly offensive behavior.

139.    Wiretapping and the surreptitious recording of communications, including PII, is highly offensive behavior.

140.    Plaintiff and Class Members were harmed by Defendant's facilitation of Tracking Entities' intrusion upon their seclusion. Plaintiff and Class Members are entitled to reasonable compensation, including disgorgement of profits derived from unlawful internet tracking.

## THIRD CAUSE OF ACTION
### Violations of the Texas Deceptive Trade Practices and Consumer Protection Act
### Tex. Bus. & Com. Code § 17.41 et seq.
### (On behalf of Plaintiff and All Class Members)

141.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

142.    The Plaintiff brings this Count on behalf of themselves and the Class Members against Defendant.

143.    Defendant, the Plaintiff, and the Class Members are "persons" within the meaning of the Tex. Bus. & Com. Code. § 17.45(3).

144.    Defendant engaged in "trade" or "commerce" within the meaning of Tex. Bus. & Com. Code § 17.45(6).

145.    The Texas Deceptive Trade Practices and Consumer Protection Act makes unlawful "False, misleading, or deceptive acts or practices in the conduct of any trade or commerce. . ." Tex. Bus. & Com. Code § 17.46(a).

146.    Defendant engaged in misleading, false, or deceptive acts that violated the Texas Deceptive Trade Practices and Consumer Protection Act.

147.    Plaintiff and Class Members are consumers because they either paid for, sought, or booked services from Defendant through the Website and, in doing so, had their Sensitive Information harvested.

148.    Defendant intended to mislead Plaintiff and the Class Members and induce them to rely on its misrepresentations and omissions.

149.    Defendant's misrepresentations and omissions were material because they were likely to deceive reasonable consumers.

150.    Under the circumstances, consumers had a reasonable interpretation of Defendant's misrepresentations and omissions.

151.    Defendant had a duty to disclose material facts to consumers, including that tracking would continue even after consumers declined the sale of their information, because such facts were contrary to Defendant's express representations and created a false impression regarding consumers' privacy choices.

152.    Defendant's acts and practices caused or were likely to cause substantial injury to consumers, including the unauthorized collection and use of personal data, loss of privacy, and economic harm, which were not reasonably avoidable by consumers and not outweighed by any countervailing benefits to consumers or competition.

153.    The injury to consumers was and is substantial because it was non-trivial and nonspeculative; and involved a concrete monetary injury. The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

154.    Consumers could not have reasonably avoided injury because Defendant's deceptive cookie and privacy practices deprived them of meaningful choice and created an information asymmetry that prevented consumers from making informed decisions about their personal data.

155.    Defendant's violations present a continuing risk to the Class Members, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

156.    Pursuant to Tex. Bus. & Com. Code § 17.50, the Class Members seek to recover actual damages in an amount to be determined at trial; an order enjoining Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under Tex. Bus. & Com. Code § 17.41 et seq.

## FOURTH CAUSE OF ACTION
### Common Law Fraud, Deceit and/or Misrepresentation
### (On behalf of Plaintiff and All Class Members)

157.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

158.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

159.    Defendant made affirmative representations to users through its Cookie Settings interface, and related disclosures that users could opt out of the sale or sharing of personal information and could decline all non-essential cookies.

160.    Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and performance cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

161.    Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm the Website's cookie preferences.

162.    Defendant's representations were false and misleading. After users, including Plaintiff, exercised their opt-out choices and declined non-essential cookies, Defendant continued to deploy Tracking Tools and continued to transmit user data to Tracking Tools.

163.    Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

164.    Defendant had the technical ability to prevent post opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

165.    Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

166.    Plaintiff and Class Members reasonably and justifiably relied on Defendant's false representations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

167.    Plaintiff's reliance was reasonable because Defendant presented the Cookie Settings interface as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

168.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

169.    Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' Sensitive Information despite representing that such practices would cease upon opt-out.

170.    Plaintiff and Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of Plaintiff and All Class Members)

171.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

172.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

173.    Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Sensitive Information. Defendant used that information to enhance advertising, marketing, and sales, and overall to generate revenue.

174.    Defendant's retention of those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent is unjust.

175.    Plaintiff and Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by the Defendant. Therefore, Plaintiff and Class Members are entitled to the relief set forth below.

## DEMAND FOR TRIAL BY JURY

176.    Plaintiff demands a trial by jury of all issues so triable.

## PRAYER

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows: An order certifying the class and making all appropriate class management orders;

a.    For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Class and their counsel as Class Counsel;

b.    For an order declaring the Defendant's conduct violates the statues referenced herein;

c.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

e.    An award of statutory damages or penalties to the extent available;

f.    For damages in amounts to be determined by the Court and/or jury;

g.    For pre-judgment interest on all amounts awarded;

h.    For an order of restitution and all other forms of monetary relief;

i.       An award of all reasonable attorneys' fees and costs; and

j.       Such other and further relief as the Court deems necessary and appropriate.

Dated: February 8, 2026

**FOSTER YARBOROUGH**
**KILLINGSWORTH PLLC**

By: */s/ Donald Patrick Yarborough*
Donald Patrick A. Yarborough
Texas Bar No. 24084129
440 Louisiana Street, Suite 1800
Houston, TX 77002
Telephone: (712) 331-5254
Email: patrick@fyktriallaw.com
Email: patrick@ecf.courtdrive.com

Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming