# EXHIBIT A

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com
sbeck@bursor.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SYDNEY DUNN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EUROPEAN WAX CENTER, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Sydney Dunn brings this action on behalf of herself and all others similarly situated (the "Class Members") against European Wax Center, Inc. ("Defendant" or "European Wax"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge.

## INTRODUCTION

1. This is a class action lawsuit brought on behalf of all U.S. residents who accessed and navigated www.waxcenter.com (the "Website") and whose electronic communications were intercepted or recorded by third parties Attentive Mobile Inc. ("Attentive"), LinkedIn Corporation ("LinkedIn") and Snap, Inc. ("Snapchat") (collectively, the "Third Parties"). With its "more than 1,000 locations nationwide," Defendant is "the largest provider of waxing services in the United States."[1] Waxing services involve inherently sensitive information due to the personal nature of the services provided. Defendant is aware of this, and promises its customers that the cookies it uses on the Website will not store personal information related to their use of the Website.[2]

2. Despite this promise, Defendant aids, agrees with, employs, or otherwise enables multiple third parties—Attentive, LinkedIn, and Snap—to eavesdrop on communications sent and received by Plaintiff and Class Members on the Website that Defendant owns and operates, including communications that contain sensitive and personal information. By failing to procure consent before enabling the Third Parties to intercept these communications, Defendant violated the Electronic Communications Privacy Act ("ECPA"), California Invasion of Privacy Act ("CIPA") § 631, and California Constitution.

## PARTIES

3. Plaintiff Sydney Dunn is a resident and citizen of Concord, California. Between June and October 2024, Plaintiff visited the European Wax website at least three times to schedule multiple appointments. At all relevant times, Plaintiff maintained active accounts with both

---

[1] EUROPEAN WAX CENTER, ABOUT US, https://waxcenter.com/pages/about-us.

[2] EUROPEAN WAX CENTER, TARGETING COOKIES, https://waxcenter.com.

Snapchat and LinkedIn. Plaintiff was in California when she visited the Website. Her communications on each of these visits were intercepted in transit by the Third Parties—as enabled by Defendant—including communications that contained personally identifiable information ("PII"), as well as private information related to Plaintiff's appointments, including the specific waxing services she was receiving. Neither Defendant nor the Third Parties procured Plaintiff's consent prior to these interceptions, nor was Plaintiff on notice of the fact that such interceptions were occurring.

4. Defendant European Wax Center, Inc. is a Delaware corporation with its headquarters located in Plano, Texas. Defendant owns and operates the Website and chose to install the tracking technologies provided by the Third Parties onto its Website.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

6. This Court has personal jurisdiction over Defendant because Defendant purposefully directs its business activities in this district by offering its services to residents of this District and performing services in this District.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this District, and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

### A. Overview of the California Invasion of Privacy Act

8. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new

devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

9. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

10. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

11. As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). Specifically, CIPA § 631(a) prohibits any person or entity from:

> (i) "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";
>
> (ii) "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or
>
> (iii) "us[ing], or attempt[ing] to use . . . any information so obtained."

12. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[]

with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

13. Individuals may bring an action against a violator of CIPA § 631 for $5,000 per violation. Cal. Penal Code § 637.3.

**B. Defendant's Privacy Representations**

14. Defendant owns and operates the Website. Unbeknownst to users, Defendant integrated the Attentive tracking code, LinkedIn Insight Tag, and Snap Pixel (collectively the "Tracking Technologies") into the Website to assist with its marketing efforts.

15. When consumers access the Website, Defendant promises that it will keep their electronic communications confidential by presenting them with a prominent banner that describes the use of targeting cookies:

> **Targeting Cookies**
>
> These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

**Figure 1**

16. As shown above, Defendant explicitly represents that its use of cookies does not store directly personal information.

17. Despite promising to keep electronic communications confidential, Defendant systematically discloses such information to numerous third parties.

18. As courts across the country have recognized, the identifiers that the Tracking Technologies capture—email address, phone number and social media IDs—constitute "directly personal information." By capturing this information anyway, Defendant fails to receive consent from visitors to intercept their communications.

**C. Attentive's Tracking Technology**

19. Attentive operates one of the largest marketing platforms in the country. "[O]ver 27% of the top 1,000 retailers in North America, including: 40% of the top apparel brands, 40% of

the top jewelry brands, [and] 33% of the top health and beauty brands" utilize Attentive's marketing services.[3] Given Attentive's pervasiveness, the company has collected more than "1.8 billion email and phone numbers" and "1.4 trillion customer data points."[4]

20. To unlock the "full advantage" of its platform, Attentive requires retailers to integrate the "Attentive Tag" into their websites.[5] The Attentive Tag captures "behavioral data, page view, product view, add to cart, and purchase events."[6]

21. Through the Attentive Tag, Attentive "analyze[s] behaviors across the entire customer life cycle."[7] In exchange for that information, Attentive provides retailers with "a treasure trove of insights about [their] customers' shopping habits, like their browsing and purchasing history."[8]

22. Attentive collects and assimilates personal information into its "Identity Graph," which is "a web of data built with multiple unique identifiers (*e.g.*, cookies, phone numbers, email, on-site shopping behavior, device information, first name, last name, etc.) with the customer at the center."[9] Through the Identity Graph, Attentive offers retailers "a comprehensive customer profile."

---

[3] ATTENTIVE, RETAIL & E-COMMERCE, https://attentive.com/retail-ecommerce-marketing.

[4] ATTENTIVE, AUDIENCE MANAGER, https://www.attentive.com/audience-segmentation-manager.

[5] ATTENTIVE, THE ATTENTIVE TAG, https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag.

[6] *Id.*

[7] ATTENTIVE, ANALYTICS, https://www.attentive.com/sms-analytics-and-reporting.

[8] ATTENTIVE, HOW TO MAKE THE MOST OUT OF YOUR WEB TRAFFIC, https://www.attentive.com/blog/web-traffic-optimization.

[9] ATTENTIVE, WHY ATTENTIVE SIGNAL IS THE KEY TO UNLOCKING TOP-PERFORMING CUSTOMER EXPERIENCES, https://www.attentive.com/blog/attentive-signal-faq.




**Figure 2**

23. These profiles show various data points, like a consumer's "activities," "preferences," "[f]avorite products," and "[d]evices."

24. Each profile also contains tabs for "Subscriptions," "Activities," "Attributes," and "Offers."[10]




**Figure 3**

[10] ATTENTIVE, VIEW SUBSCRIBER PROFILES, https://help.attentivemobile.com/hc/en-us/articles/4412398776724-View-subscriber-profiles.

25. The "Activities" tab reveals the content of the consumer's electronic communications.




**Figure 4**

26. To maintain its market share, Attentive constantly innovates to address "signal loss." Signal loss "refers to the diminishing strength of pixel fires on important signals or data points (such as purchase events), which were once reliably tied to campaigns and individual users."[11] To mitigate that loss, Attentive developed "Attentive Signals." Attentive's Chief Strategy Officer, Eric Miao, best explains the innovation:

> Attentive Signal is our identity product. It's at the core of our platform. It powers everything you can do with it—from optimizing your customer segmentation strategy to triggering top-performing journeys. It collects and attributes a vast amount of shopper data directly to Attentive subscribers. This includes everything from zero-party data, like shopping preferences, to enrichment data, like device information.[12]

27. Put differently, "Attentive Signal is an identity solution that enables marketers to understand who's shopping on their site, identify specific habits, and build personalized

---

[11] Erik Koenig, *How To Overcome Signal Loss In Digital Marketing Campaigns*, FORBES, Jul. 19, 2023), https://www.forbes.com/councils/forbesagencycouncil/2023/07/19/how-to-overcome-signal-loss-in-digital-marketing-campaigns/.

[12] ATTENTIVE, ATTENTIVE SIGNAL, https://www.attentive.com/signal-identity-solution.

experiences."[13] According to Attentive, it's so effective "that no matter where or how someone chooses to shop, all of their data can be linked back to their unique profile."[14] It's so effective, in other words, that Attentive can eliminate the "three key factors that contribute to signal loss": "evolving privacy requirements," "advanced ad-blockers," and "savvy customers."[15]

**D. Defendant's Use of Attentive's Tracking Technology**

28. Defendant integrated code from Attentive—including but not limited to the Attentive Tag—into its website for the purpose of "capturing behavioral data" and linking it to personally identifiable information.

29. When consumers access and navigate the Website, Attentive's software script surreptitiously directs the user's browser to send a separate message to Attentive's servers. This second, secret transmission contains the original GET request[16] sent to the host website along with additional data that Attentive's code is configured to collect. This transmission is initiated by Attentive's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Attentive's embedded code.

---

[13] *Id.*

[14] ATTENTIVE, *supra* note 9.

[15] *Id.*

[16] "A GET request is an HTTP request used to retrieve data from a specific web page. For example, when you type in a URL into your browser and click enter, your browser sends a GET request to the server hosting that URL, requesting to retrieve the associated HTML code." *See* Iveta Vistorskyte, *How to Send GET Requests With cURL*, OXYLAB (June 9, 2023), https://oxylabs.io/blog/curl-get-requests.

30. When consumers book an appointment on Defendant's website, they are required to create an account, which requires inputting their phone number and email address:




**Figure 5**

31. Unbeknownst to consumers, when they create the account, Defendant aids, agrees with, employs, or otherwise enables Attentive to contemporaneously receive an unencrypted version of the email and phone number:

m {"source":"fs","email":"yyy222@yahoo.com"}
m {"source":"fs","phone":"9546678899"}

**Figure 6**

32. Attentive also pairs those direct identifiers with event data, like "page views and purchases."[17] For example, when a consumer books a Brazilian Wax, Attentive receives the type of waxing appointment booked, and pairs such information with a unique ID assigned to each customer.


Request URL https://waxcenter-us.attn.tv/unrenderedCreative?v=4.40.3&r=https%3A%2F%2Fwaxcenter.com%2Fcollections%2Fall&id=7f329cd1ba1a457e8fcba6163ad86177&pv=2&l=https%3A%2F%2Fwaxcenter.com%2Fpages%2Fbrazilian-waxing&w=947&h=1271&ss_ref=https%3A%2F%2Freservations.waxcenter.com%2FwebstoreNew%2Fservices%2Fthankyou%3Futm_source%3Dgoogle%26utm_source%3Dgoogle%26utm_medium%3Dcpc%26utm_medium%3Dcpc%26utm_campaign%3Dnational_nearme_exact%26utm_campaign%3D%257B%257Bcampaign.name%257D%257D%26acadia_medium%3Dcpc%26acadia_source%3Dgoogle%26gad_source%3D1%26gad_campaignid%3D21666886247%26gbraid%3D0AAAAADLvff5jgpGTY9n1yyc5Wh4vCwWd_%26gclid%3DCj0KCQjwsNnCBhDRARIsAEzia4A3qMqB56bUsHZIRPNOQTOQTAWB3qFEIBNpBuwhfH_TEI60lYYfsFoaAgevEALw_wcB%26location%3Db7763624-693e-4034-bdc2-423fad1363ab&f=3
Request Method POST

**Figure 7**

33. These confidential communications are the product of users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, the confidential communications stem from users typing into data fields and actively making other selections. All of the foregoing is information created through the intent of the users: information created by and in response to users' communicative inputs; information created by and in response to users' intended messages to the websites at issue and Defendant; and information created by and in response to users having conveyed and expressed their respective desires that the websites would supply them with certain, highly personalized, types of information and/or responses.

34. Defendant never received consent from Plaintiff and Class Members to work with Attentive to intercept their electronic communications, including those that contained their personally identifiable information.

35. Through Attentive's tracking technology, Defendant can export a spreadsheet showing all customers who input their phone number and email address into the sign-up unit on the Website, and utilize such information for targeted advertising.

[17] ATTENTIVE, *supra* note 5.

**E. LinkedIn's Tracking Technology**

36. LinkedIn markets itself as "the world's largest professional network on the internet[.]"[18] But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network. LinkedIn has moved into the marketing and advertising space and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[19] Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[20]

37. According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates." [21] Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement. To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[22] LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience. The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[23]

38. As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[24]

---

[18] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441.

[19] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[20] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[21] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[22] LINKEDIN, *supra* note 18.

[23] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[24] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent,

39. The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, Predictive Audience, and LinkedIn Audience Network.[25]

40. Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allow marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[26]

41. For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[27] According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[28]

---

behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[25] *See id.*

[26] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[27] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[28] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

42. In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[29] That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[30]

43. According to LinkedIn, the LinkedIn Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[31] LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[32]

44. LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[33] A critical feature allows the LinkedIn Insight Tag to track users, even when third-party cookies are blocked.[34] LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[35] Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn. Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its software.[36] Instead, the LinkedIn Insight Tag is shielded with the same privacy exemptions offered to first-party cookies.

---

[29] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings

[30] Dencheva, *supra* note 20.

[31] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[32] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[33] LINKEDIN, *supra* note 24.

[34] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[35] *See id.*

[36] *See id.*

45. When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

46. These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

47. The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies. Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[37]

48. For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[38] Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[39]

49. A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based on information it obtains through the LinkedIn Insight Tag, which Defendant installed on the Website, LinkedIn is able to target its account holders for advertising.

50. LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, LinkedIn expressly warrants the opposite. Similarly, Defendant never receive consent from its customers to share information with LinkedIn.

51. When first signing up, a user agrees to the User Agreement.[40] By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[41] and the Cookie Policy.[42]

---

[37] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[38] *See id.*

[39] *See id.*

[40] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[41] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[42] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

52. LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[43]

53. The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[44] LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[45]

54. However, LinkedIn offers an express representation: "We will only collect and process personal data about you where we have lawful bases."[46]

55. Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

56. Unbeknownst to users, however, Defendant aids, agrees with, employs, or otherwise enables LinkedIn to eavesdrop on private communications concerning body waxing services using the LinkedIn Insight Tag.

**F. Defendant's Use of LinkedIn's Tracking Technology**

57. As illustrated below, Defendant integrated code from LinkedIn—including the LinkedIn Insight Tag—into its website to intercept confidential communications when a user schedules a waxing appointment, for marketing purposes.

58. When users access and navigate the Website, LinkedIn's software script surreptitiously directs the user's browser to send a separate message to LinkedIn's servers. This second, secret transmission contains the original GET request sent to the host website along with additional data that the LinkedIn Insight Tag is configured to collect. This transmission is initiated

---

[43] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[44] *Id.*

[45] *Id.*

[46] *Id.* (emphasis added).

by the LinkedIn Insight Tag and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and LinkedIn's embedded code.

59. When users access the Website, Defendant discloses the URLs and page titles of every page that they visit, including during the booking process. The URLs and page titles disclose what type of waxing appointment the user is seeking to book. For example, if a user goes to book a Brazilian Wax, LinkedIn receives the following information:


```
▾ {pids: [3775409], scriptVersion: 230, time: 1750689895136, domain: "waxcenter.com",…}
  domain: "waxcenter.com"
  hem: null
  isLinkedInApp: false
  isTranslated: false
  liFatId: ""
  liGiant: ""
 ▾ misc: {psbState: -4}
   psbState: -4
  pageTitle: "Bikini and Brazilian Waxing | European Wax Center"
 ▾ pids: [3775409]
   0: 3775409
  scriptVersion: 230
  signalType: "PAGE_VISIT"
  time: 1750689895136
  url: "https://waxcenter.com/pages/brazilian-waxing"
  websiteSignalRequestId: "2d5ece1e-c8cf-2f5e-3fb9-cac22732d8ea"
```


**Figure 8**

60. Further, Defendant discloses to LinkedIn when users book an appointment, and the type waxing appointment booked via a "CLICK" event. For example, if a user books a Brazilian Wax, LinkedIn receives the following information:


```
▾ Request Payload    View source
 ▾ {pids: [3775409], scriptVersion: 230, time: 1750527132963, domain: "waxcenter.com",…}
  ▾ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "A",…}
     backgroundImageSrc: null
     cursor: "pointer"
     elementSemanticType: null
     elementTitle: null
     elementType: null
     elementValue: null
     imageAlt: null
     imageSrc: null
     innerText: "BOOK IT"
     tagName: "A"
   domain: "waxcenter.com"
  ▸ elementCrumbsTree: [{tagName: "div", nthChild: 6, classes: ["transition-body"]},…]
   hem: null
   href: "https://locations.waxcenter.com/?_gl=1*11xs9xk*_ga*MTMzMDM1NDU3OC4xNjU0MTg1Njg1*_ga_983WWQZ8RG*MTY1NDY0MjY1Ny4xOC4wLjE2NTQ2NDI2NTcuMA.."
   innerElements: null
   isFilteredByClient: false
   isLinkedInApp: false
   isTranslated: false
   liFatId: ""
   liGiant: ""
  ▸ misc: {psbState: -4}
   pageTitle: "Bikini and Brazilian Waxing | European Wax Center"
  ▸ pids: [3775409]
   scriptVersion: 230
   signalType: "CLICK"
   time: 1750527132963
   url: "https://waxcenter.com/pages/brazilian-waxing"
   websiteSignalRequestId: "d06e224a-84fc-5a13-7081-184a260ca11b"
```


**Figure 9**

61. The information disclosed by Defendant was also accompanied by the "lms_ads" and "li_sugr" cookies, whereby LinkedIn could connect the disclosed private information concerning waxing services with the user's LinkedIn profile.

62. The information shared by Defendant allows LinkedIn to know the identities of specific individuals as well as information related to their waxing appointments. *See* Figures 6–7. This allows companies, including Defendant, to profit from this information for targeted advertising purposes.

**G. Snapchat's Tracking Technology**

63. Snapchat is a social media and messaging application that "offers a range of APIs through its Snap Kit, Lens Studio, and Marketing API, allowing developers to integrate Snapchat's features into their own applications."[47] Snapchat's Marketing API "is used for creating, managing, and optimizing advertising campaigns on Snapchat, including for targeting, budding, and tracking ad performance."[48]

64. Specifically, the Snapchat Marketing tool "provides a programmable interface to interact with Snapchat's advertising tools. This API enables automated creation and management of ad campaigns, audience targeting, and performance analytics, which can be a boom for marketers seeking to streamline their Snapchat advertising workflows."[49]

65. Snapchat offers a software service called "Snap Pixel," which "helps advertisers measure results, optimize targeting, and build audiences for their ad campaigns."[50] The Snap Pixel is part of a line of prebuilt software tools under the "Business" product line that allow the delivery of personalized ads by collecting user data through the Snap Pixel, which is used to deliver more effective targeted advertisements, increasing revenue for the websites that install the Pixel.

66. The Snap Pixel can be plugged into any website, as the pixel is "a piece of

[47] Charu Mitra Dubey, *Snapchat API: Developer Guide on How to Integrate Snapchat API*, PHYLLO (July 10, 2024), https://www.getphyllo.com/post/snapchat-api-guide.

[48] *Id.*

[49] *Snapchat Marketing API Integrations*, PIPEDREAM, https://pipedream.com/apps/snapchat-marketing.

[50] *Power Performance with the Snap Pixel*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel.

JavaScript code that's either installed on [a] website or integrated with an e-commerce store."[51]

67. When users interact with a webpage with the Snap Pixel installed, the Snap Pixel "tracks a variety of actions on [a] website, such as page views, add-to-cart actions, purchases, and sing-ups," as well as other "events," such as answering a quiz on a website.[52] The information is sent automatically to Snapchat.

68. The Snapchat Pixel "may send . . . (hashed) email addresses, (hashed) phone numbers and/or device identifiers, IP addresses, cookie IDs, metadata, and browser/app information" to Snap.[53] The information sent via is also accompanied with the sc_at cookie. Snapchat indicates that the sc_at cookie is "[u]sed to identify a visitor across multiple domains."[54]

69. The Snapchat advertising business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Snap Pixel.

70. One of Snapchat's partners is European Wax.

71. Thus, through websites that install the Snap Pixel, Snapchat directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

72. When the Snap Pixel is used on an entry to a website, it is not like a tape recorder, or a "tool" used by one party to record the other. Instead, the Snap Pixel involves Snapchat, a separate and distinct third-party entity from the parties in the conversation. That data is then analyzed by Snapchat before being provided to any entity that was a party to the conversation, like Defendant.

73. The purpose of such transmissions is so companies, like Defendant, can better advertise and target consumers on Snap's social media platform by enabling Snap to learn who visits the companies' websites. This also benefits Snap, as it allows Snap to monetize its Snapchat

---

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Cookie Information*, SNAPCHAT, https://www.snap.com/privacy/cooke-information.

social media platform through advertising revenue, and the better at targeting Snap is, the more companies, like Defendant, will pay to advertise on Snapchat.

74. Indeed, Snap provides various forms of targeted advertising based on the information it collects, including location and demographic targeting, e-mail based targeting, or targeting based on those similar to companies' "customer list or Pixel Custom Audience."[55] And, Snap will actually tell website operators like Defendant "how well your pixel setup matches events to Snapchat Accounts," enabling companies, like Defendant, to send further identifying information to Snap so it can better match website users to Snapchat accounts.[56]




**Figure 10**

75. Nowhere on the Website does Defendant request or receive users' affirmative consent. In fact, Defendant's express representations warrant the opposite. The Tracking Technologies are active as soon as the Website loads, before users could even conceivably be put on notice or provide affirmative consent to the tracking at issue here.

**H. Defendant's Use of Snapchat's Tracking Technology**

76. As illustrated below, Snapchat, as enabled by Defendant, intercepts confidential communications when a consumer schedules a waxing appointment.

[55] *Meet Your Audience*, SNAPCHAT BUSINESS, https://forbusiness.snapchat.com/advertising/targeting.

[56] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel.

77. When users select a waxing appointment from European Wax, they visit the URL for that service on the Website:




**Figure 11**

78. When a user books an appointment on the Website, Snapchat, as enabled by Defendant, contemporaneously intercepts the names of the services users schedule for themselves.

79. For example, if a user booked a "Brazilian Waxing" snapchat would receive the following information:




**Figure 12**

80. Snapchat, as enabled by Defendant, contemporaneously intercepts the names of the services users schedule for themselves on the Website, and links it with the user's snapchat profile using the sc_at cookie.

## CLASS ALLEGATIONS

81. **Class Definition:** Plaintiff brings this action individually and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

> The **Nationwide Class** that Plaintiff seeks to represent is defined as:
> All individuals residing in the United States who booked an appointment for wax services on the website, www.waxcenter.com, during the Class Period.
>
> The **California Subclass** that Plaintiff seeks to represent is defined as:
> All individuals residing in California who booked an appointment for wax services on the website, www.waxcenter.com, during the Class Period.

82. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

83. The Nationwide Class and California Subclass are referred to collectively as the "Classes."

84. Excluded from the proposed Classes are Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

85. Plaintiff reserves the right to amend the definitions of the Class or Subclass and add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

86. **Numerosity:** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are at least thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and third-parties Attentive's, LinkedIn's, and Snapchat's records.

87. **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes. The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:

a. Whether Defendant's acts and practices violated the ECPA.

b. Whether Defendant's acts and practices violated CIPA § 631;

c. Whether Defendant's acts and practices violated the privacy rights of Plaintiff and members of the California Class under the California Constitution; and

d. Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

88. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to Third Parties.

89. **Adequacy:** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Classes she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

90. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment

of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
**Violation Of The Electronic Communication Privacy Act,**
**18 U.S.C. § 2511, *et seq.***
**(On Behalf of the Nationwide Class)**

91. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

92. Plaintiff brings this claim on behalf of herself and members of the Nationwide Class.

93. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

94. The ECPA protects both sending and the receipt of communications.

95. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

96. The transmission of Plaintiff's sensitive and personal information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

97. The transmission of PII between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

98. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

99. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

100. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

101. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant and Attentive used to track Plaintiff's and Class Members' communications while they were navigating the Website;

b. The computer codes and programs Defendant and LinkedIn used to track Plaintiff's and Class Members' communications while they were navigating the Website;

c. The computer codes and programs Defendant and Snapchat used to track Plaintiff's and Class Members' communications while they were navigating the Website;

d. Plaintiff's and Class Members' browsers;

e. Plaintiff's and Class Members' mobile devices;

f. Defendant's and Attentive's web and ad servers;

g. Defendant's and LinkedIn's web and ad servers;

h. Defendant's and Snapchat's web and ad servers;

i. The plan that Defendant and Attentive carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website;

j. The plan that Defendant and LinkedIn carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website; and

k. The plan that Defendant and Snapchat carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were

using a web browser to navigate the Website.

102. Plaintiff's and Class Members' interactions with Defendant's website are electronic communications under the ECPA.

103. By utilizing and embedding the tracking technologies provided by Attentive, LinkedIn, and Snapchat on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

104. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technologies provided by Attentive, LinkedIn, and Snapchat on its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and sensitive and personal information to Attentive, LinkedIn, and Snapchat.

105. The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PII, including their identities and information related to their private waxing appointments. This confidential information is then monetized for targeted advertising purposes, among other things.

106. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Attentive, LinkedIn, and Snapchat through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

107. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

108. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy.

109. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that

intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

110. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiff and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of the California Subclass)**

111. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

112. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

113. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

114. A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or

> [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

115. Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

116. To avoid liability under § 631(a), a defendant must show it had the consent of all parties to a communication.

117. At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiff and Class Members

118. Defendant, when aiding and assisting the Third Parties' wiretapping and eavesdropping, intended to help the Third Parties learn some meaning of the content in the URLs and the content the visitor requested.

119. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Technologies fall under the broad catch-all category of "any other manner":

a. The computer codes and programs the Third Parties used to track Plaintiff and Class Members' communications while they were navigating www.waxcenter.com;
b. Plaintiff's and Class Members' browsers;
c. Plaintiff's and Class Members' computing and mobile devices;
d. Attentive's web and ad servers;
e. LinkedIn's web and ad servers;
f. Snapchat's web and ad servers;

Case 4:25-cv-05494 Document 1 Filed 06/30/25 Page 29 of 31

g. The web and ad-servers from which the Third Parties tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.waxcenter.com;

h. The computer codes and programs used by the Third Parties to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.waxcenter.com; and

i. The plan the Third Parties carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to visit www.waxcenter.com.

120. The information that Defendant transmitted using the Tracking Technologies constituted sensitive and confidential personally identifiable information.

121. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting the Third Parties to receive its customers' sensitive and confidential online communications through www.waxcenter.com without their consent.

122. As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT III**
**Invasion of Privacy Under California's Constitution**
**(On Behalf of the California Subclass)**

123. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

124. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

125. Plaintiff and Class Members have an interest in: (1) precluding the dissemination of

their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

126. At all relevant times, by using the Tracking Technologies to record and communicate their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

127. Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential and that Defendant would not install wiretaps on www.waxcenter.com.

128. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive confidential online communications.

129. The invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and private online communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

130. Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the putative Nationwide Class and California Subclass defined above, naming Plaintiff as the representative of the putative Classes, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class and Subclass Members;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the putative Classes on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiff and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demand a trial by jury of any and all issues in this action so triable of right.

Dated: June 30, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: */s/ Sarah N. Westcot*
Sarah N. Westcot

Sarah N. Westcot (State Bar No. 264916)
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com
sbeck@bursor.com

*Counsel for Plaintiff*